**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (EK-8989)
55 Broadway, 10th Floor
New York, New York 10006
Tel.:  (212) 363-7500
Fax:  (212) 363-7171
Email: ek@zlk.com

*Attorneys for Plaintiff*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HONEYWELL INTERNATIONAL INC., DARIUS ADAMCZYK, and THOMAS A. SZLOSEK, <br><br> Defendants. | Civ. No. ___2:19-cv-12542___ <br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Wayne County Employees' Retirement System, individually and on behalf of all other persons similarly situated (hereinafter "Plaintiff"), by its undersigned attorneys, alleges in this Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to its

own acts, and upon facts obtained through an investigation conducted by its counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Honeywell International Inc. ("Honeywell") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Honeywell's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning Honeywell; and (d) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Honeywell securities from February 9, 2018 through October 19, 2018, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against Honeywell, and its corporate officers, Darius Adamczyk and Thomas A. Szlosek (collectively, "Defendants") during the Class Period.

2.     Honeywell has been at the epicenter of asbestos litigation for nearly two decades. In 1999, Honeywell acquired The Bendix Corporation, and with it took ownership of Bendix's asbestos-related liabilities. Those liabilities arose from Bendix's use of asbestos while manufacturing brakes over a forty-year period beginning in 1939. In its annual Form 10-K report for 2017 dated February 9, 2018 (the "2017 10-K"), Honeywell estimated its Bendix asbestos-related liability to be $616 million. This figure was a gross underestimation of what the company's Bendix

asbestos-related liability truly was. As would be revealed, and only after intervention from the SEC, Honeywell's actual Bendix asbestos-related liability was almost ***three times*** as high—$1.703 billion.

3.      Honeywell manufactured its initial Bendix estimates by manipulating the manner in which it was supposed to account for loss contingencies under Accounting Standards Codification ("ASC") Rule 450. Honeywell also ignored generally accepted accounting principles, industry norms, and even its own processes for calculating asbestos-related liabilities for other segments of Honeywell's business. Bendix was special, according to Honeywell, and for that reason the company claimed it was justified in giving investors a wildly misleading account of the risks arising from the Bendix asbestos-related liability.

4.      Over the course of the Class Period, Honeywell repeatedly provided investors with materially incorrect accounts of its Bendix asbestos-related liability and false descriptions of the company's internal controls over financial reporting and public disclosures. These misrepresentations were present in each quarterly and annual report that Honeywell filed with the SEC. As a result of these misrepresentations, Honeywell's stock price during the Class Period was artificially inflated.

5.      On August 23, 2018, investors began to discover the truth about the Bendix asbestos-related liability. In a report on Form 8-K filed with the SEC before market hours, Honeywell disclosed that it needed to "revise[] its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims" and indicated that its Bendix asbestos-related liability would need to be increased by $1.083 billion (from $610 million to $1.693 billion as of June 30, 2018).

6.      Honeywell attempted to distract the market from this bad news, however. Contemporaneously with the Form 8-K, Honeywell issued a press release

(also during pre-market hours) announcing a number of positive developments at the company, including progress on its spin-offs of Garrett Motion Inc. and Resideo Technologies, Inc. (two of Honeywell's subsidiaries). The press release also announced that Honeywell was increasing its full-year earnings-per-share guidance by $0.05 per share (to $8.10-$8.20). Reacting to these favorable announcements, analysts largely considered "today's news as positive" and "expect[ed] the stock to outperform modestly on the back of the guidance raise and spin progress." Despite this aggressive attempt to minimize any sell-off resulting from its massive increase in asbestos liability, Honeywell's stock price still declined from an opening market price of $151.30 per share on August 23, 2018 to an adjusted closing price of $149.33 per share on August 24, 2018.

7.      The next disclosure came on October 10, 2018, during trading hours, when the SEC's Division of Corporation Finance released correspondence it had had with Honeywell on August 14 and 20, 2018 about its accounting for Bendix asbestos-related liability. The correspondence included an initial inquiry from the SEC and a response from John Tus, Honeywell's Vice President and Controller. In its response, Tus admitted that Honeywell's internal controls for determining the Bendix asbestos-related liability had been deficient, and intentionally so. Tus confirmed that, despite ASC 450 being "the authoritative accounting standard under U.S. GAAP concerning loss contingencies," Honeywell "had not appropriately applied the provisions of ASC 450" due to the fact that its liability estimates did not "reflect the full term of the epidemiological projections in the measurement of such liability."

8.      Contrary to ASC 450, Honeywell had been estimating its Bendix asbestos-related liability for a five-year period (or five year horizon) only. Honeywell's estimates, therefore, disregarded all potential for liability arising more than five years in the future. As admitted in its response, Tus explained that

Honeywell "inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. [Honeywell] had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. [Honeywell] did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence."

9.      In other words, Honeywell had the necessary data and properly valued its asbestos-related liability, but deliberately chose to disclose only a fraction of that liability to the public. Honeywell thus directly contradicted the purpose of generally accepted accounting principles and the federal securities laws which is to provide investors and the public with accurate information about Honeywell's business, including its asbestos-related liability.

10.     The information contained in Honeywell's correspondence with the SEC was material and, accordingly, it resulted in a sharp decline in the price of Honeywell's stock. From an opening market price of $155.76 per share on October 10, 2018, Honeywell's stock price fell to an adjusted closing price of $147.24 per share on October 11, 2018. It would have fallen further, but for another attempt by Honeywell to conceal the truth behind its accounting scheme. Honeywell itself did not disclose the SEC correspondence regarding its accounting and, despite hosting an investor conference that same day, did not even mention the word "asbestos."

11.     On October 19, 2018, Honeywell was no longer able to keep investors in the dark about its Bendix liability accounting scheme. Before market hours, the company released its quarterly report on Form 10-Q for the third quarter of 2018 (the "Q3'18 10-Q"). In it, Honeywell provided investors with the new Bendix asbestos-related liability figures as well as the fact that the SEC's Division of

Enforcement had commenced an investigation into Honeywell's Bendix accounting on September 13, 2018.

12.     This was material news for Honeywell investors. Indeed, on October 19, 2018, the *Wall Street Journal* immediately published an article, titled *SEC Opens Investigation Into Honeywell's Asbestos Accounting*. In pertinent part, the article stated that the "Securities and Exchange Commission ha[d] opened an investigation into the company's accounting for asbestos-related liabilities" following "discussions with the SEC that prompted it to correct and restate its asbestos liabilities by about $1.1 billion more than its prior estimate."

13.     Following Honeywell's disclosure of the new Bendix liability figures and the SEC investigation, the company's stock price declined substantially. Honeywell's opening stock price on October 19, 2018 was $151.26 per share. From there, it declined to an adjusted market closing price of $146.28 per share on October 22, 2018 (the following trading day), and continued to fall further on October 23, 2018 ($144.35 adj. close) and October 24, 2018 ($139.31 adj. close).

14.     Defendants concealed material information from investors about its Bendix asbestos-related liability. This deception misled the market about the risks of their investments in Honeywell as well as exposed investors to heightened regulatory scrutiny and penalties. As the truth concerning Defendants' accounting scheme came to light, Honeywell's stock price declined significantly. From a Class Period high of $161.28 per share, Honeywell's stock eventually fell to $140.83 per share following the end of the Class Period. The rise and fall of Honeywell's stock amounted to a total market capitalization loss of more than $14.8 billion.

15.     Plaintiff and other Class members sustained significant damages as a result of the fraudulent conduct complained of herein. Defendants should be held liable for the damages that they have caused.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as Honeywell's principal executive offices are located within this Judicial District and a significant portion of Defendants' business, actions, and the subsequent damages, took place within this District.

19.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

20.     Plaintiff purchased Honeywell securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing its transactions in Honeywell is attached hereto and incorporated herein by reference.

21.     Defendant Honeywell is incorporated in Delaware, with principal executive offices located at 115 Tabor Road, Morris Plains, New Jersey 07950. Honeywell's common stock is traded on the NYSE, under the symbol "HON".

22.     Defendant Darius Adamczyk ("Adamczyk") has served at all relevant times as Honeywell's President and CEO and Chairman.

23.     Defendant Thomas A. Szlosek ("Szlosek") has served at all relevant times as the Honeywell's Chief Financial Officer.

7

24.     Defendants Adamczyk and Szlosek are sometimes referred to herein as the "Individual Defendants."

25.     Each of the Individual Defendants:

a.     directly participated in the management of Honeywell;

b.     was directly involved in the day-to-day operations of Honeywell at the highest levels;

c.     was privy to confidential proprietary information concerning Honeywell and its business and operations;

d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein;

e.     was directly or indirectly involved in the oversight or implementation of Honeywell's accounting and internal controls;

f.     was aware of or recklessly disregarded the fact that the materially misleading false and misleading statements were being issued concerning Honeywell; and/or

g.     approved or ratified these statements in violation of the federal securities laws.

26.     Honeywell is liable for the acts of the Individual Defendants and its other employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

27.     The scienter of the Individual Defendants and other employees and agents of Honeywell is similarly imputed to Honeywell under respondeat superior and common law agency principles.

28.     Honeywell and the Individual Defendants are referred to herein, collectively, as the "Defendants."

29.     The Individual Defendants, because of their positions with Honeywell, possessed the power and authority to control the contents of Honeywell's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Honeywell's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

30.     The Individual Defendants, because of their positions and access to material non-public information available to them, knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading . The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**A.     Background.**

31.     Honeywell is a multinational conglomerate that makes a variety of commercial and consumer products, engineering services, and aerospace systems.

32.     Honeywell is a defendant in asbestos-related personal injury actions related to two predecessor companies, North American Refractories Company ("NARCO"), which was sold in 1986, and Bendix Friction Materials ("Bendix") business, which was sold in 2014.

33.     NARCO produced refractory products (bricks and cement used in high temperature applications). Claimants from NARCO asbestos liabilities consist largely of individuals who allege exposure to NARCO asbestos-containing refractory products in an occupational setting.

34.     Bendix manufactured automotive brake parts that contained chrysotile asbestos in an encapsulated form. Despite known health hazards, Bendix used asbestos in its brake- and clutch-pad products until 2001. Claimants of Bendix asbestos liabilities consist largely of individuals who allege exposure to asbestos from brakes from either performing or being in the vicinity of individuals who performed brake replacements.

35.     Although Honeywell sold Bendix in 2014, Honeywell has been sued in tens of thousands of cases alleging exposure to asbestos from Bendix products, and between Honeywell and its insurance companies, over $1 billion has been spent to resolve the claims.

## B.     Asbestos Is Highly Toxic and Has Resulted in Hundreds of Billions in Liability.

36.     Asbestos is a naturally occurring mineral fiber that occurs in rock and soil.  Asbestos fibers are soft and flexible yet resistant to heat, electricity and chemical corrosion. Pure asbestos is an effective insulator, and it can also be mixed into cloth, paper, cement, plastic and other materials to make them stronger.

37.     Because of its fiber strength and heat resistance asbestos has been used in a variety of building construction materials for insulation and as a fire retardant. Asbestos has also been used in a wide range of manufactured goods, mostly in building materials (roofing shingles, ceiling and floor tiles, paper products, and asbestos cement products), friction products (automobile clutch, brake, and transmission parts), heat-resistant fabrics, packaging, gaskets, and coatings.

38.     Asbestos is toxic to human beings and results in a range of known effects, from asymptomatic scarring of the lungs (pleural plaques) to functionally limiting disease, including asbestosis and fatal cancers of the lining of the chest, heart, abdomen and lungs. Asbestosis and lung cancer are generally related to the quantum of exposure and are found among workers. Mesothelioma is a cancer

primarily of the pleura and peritoneum and can result from only trivial exposure and, thus, affects both workers and the general population, often presenting decades following exposure.

39.     The health-related risks of exposure to asbestos have been documented since at least the 1st century AD, but it was not until several landmark scientific studies in the late 1950s through to the early 1960s that a definitive link between asbestos and asbestosis, lung cancer and mesothelioma was generally accepted. While the potency of different types of asbestos is debated, evidence has shown that all types of asbestos are carcinogenic to human beings.

40.     In the US, the maximum exposure to asbestos is said to have occurred between the 1930s and the 1960s, with consumption peaking in 1973. Deaths from asbestos-related disease peaked between 1992 and 1997, which is consistent with the known lag between exposure and mortality. The spectre of mass litigation strategies still looms over companies.

## C.     Accounting for Liabilities.

41.     In order to account for the mass amount of asbestos litigation, corporate reporting includes mandated annual reports. Accounting frameworks provide the means for disclosure of both financial and non-financial information. Financial disclosures are generally mandated through accounting standard regimes and promulgated standards such as International Financial Reporting Standards (IFRS) and generally accepted accounting principles ("GAAP").

42.     ASC 450, Contingencies, the authoritative accounting standard under U.S. GAAP concerning loss contingencies, provides that a company must accrue for a loss when that loss is both probable and reasonably estimable (ASC 450-20-25-2).  If a loss is reasonably possible but not probable and is reasonably estimable, then ASC 450-20-50-3 directs that a company disclose that contingent loss but not record an accrual.  ASC 450-20 makes clear that the same standards for accrual and

disclosure of contingent liabilities apply to both unasserted claims as well as asserted claims. Specifically, ASC 450-20-55-14 provides, "[w]ith respect to unasserted claims and assessments, an entity must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. If an unfavorable outcome is probable and the amount of loss can be reasonably estimated, accrual of a loss is required by paragraph 450-20-25-2." Additionally, "If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount." ASC 450-20-30-1.

43. Prior to August 2018, Honeywell accounted for Benidx related asbestos liabilities for a limited five-year horizon. As Honeywell would later admit, this accounting policy did not comply with the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims. This is because Honeywell possessed data that could yield a probable and reasonably estimable projection of liability under ASC 450 for the full term of the epidemiological projections beyond just five years.

44. Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical claims information on which to rely when estimating a future projection of liability. Each year, Honeywell has a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support reliable estimates. For Bendix, historical claims data is readily available on a real-time basis through its day-to-day experience in the tort system. The robustness of this data supports the conclusion that

application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450.

45.     Historically, Honeywell's accounting process for recognition of the Bendix asbestos liability begins with notification of claims being asserted against Honeywell via outside counsel which also serves as the Bendix claims administrator. It continues with the processing of the claim and case resolution (either dismissal or settlement), the processing of any applicable settlement payments, the accounting for claims filings, dismissals and payment, the insurance recovery process, and ends with the related financial reporting and financial statement disclosures.

46.     In addition to a liability for pending claims (claims filed in the tort system against Honeywell as of the financial statement date), Honeywell assesses the potential liability from unasserted claims (claims expected to be filed against Honeywell in future periods).  The pending claims balance by disease category, including data on claim filings, settlements and dismissals, are reported to Honeywell on a monthly basis by its claims administrator.

47.     The amount of the pending claims liability is calculated monthly by Honeywell representing a product of the pending claims balances by disease category multiplied by the average resolution values by disease category. The average resolution values by disease category are based on actual settlements and dismissals by disease category for the previous five years (the five year calibration period). These average resolution values are monitored by Honeywell quarterly and updated in the fourth quarter each year.

48.     Honeywell utilized a third-party specialist to determine its liability for unasserted claims based on the following: Epidemiological projections of the future incidence of disease; historical claims rate experience by disease category in the tort system; and historical resolution values (settlements and dismissals) by disease category.

13

49.    The liability for unasserted claims is updated by the third-party specialist in the fourth quarter each year based on the factors described above.  The historical claims information is provided to the third-party specialist by the third-party claims administrator.

50.    As such, Honeywell's estimated value of Bendix related liabilities included future anticipated claims based on historical claims filing experience and dismissal rates, disease classifications, and average resolution values in the tort system for the previous five years.

51.    When assessing the data used to record the unasserted claims liability, Honeywell, its third-party specialists and its outside legal counsel focused on both historical data and emerging trends and discoveries. Significant weight was placed on the emerging science and studies that indicated the nature and application of the asbestos used in manufactured automotive brake parts by Bendix does not cause disease. Management also focused on evidence suggesting improvements in the tort system with regards to the resolution of asbestos claims (this information and insights having been provided to management by outside counsel).

52.    Therefore, Honeywell, along with its third-party specialist and outside legal counsel, only determined a probable and reasonably estimable future liability for unasserted claims for the next five years.

53.    However, as Honeywell would later admit, by using a limited five year period, Honeywell ignored what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. Accordingly, Honeywell "did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence."

**D.    SEC Challenges Honeywell's Accounting.**

54.     Defendants knew or were deliberately reckless regarding their accounting errors, but only decided to correct it after inquiries from the SEC.

55.     On May 1, 2018, Honeywell began the formal process of spinning out its transportation systems business, which would include the Bendix asbestos-related liabilities, by filing a draft registration statement confidentially with the SEC. The registration statement contained historical financial statements for the transportation business, to be renamed Garrett Transportation Systems Inc. (and then later renamed to Garrett Motion Inc.), that were prepared by Honeywell using the same accounting policy for its future Bendix asbestos related liabilities. The Garrett financial statements included the same provision of $616 million as of December 31, 2017 for Bendix asbestos related liabilities.

56.     On May 24, 2018, the Division of Corporation Finance at the SEC wrote to Su Ping Lu, Honeywell's Assistant General Counsel and Assistant Corporate Secretary who was also acting as director for Garrett pre-spin off, raising questions about the draft registration statement. In this letter (which was not made public until October 5, 2018), the SEC stated that Honeywell's accounting for Bendix asbestos related liabilities did not appear to comply with GAAP, specifically ASC 450. In particular, the SEC told Honeywell that

> We note your disclosure that the liability for future claims represents the estimated value of future asbestos-related bodily injury claims expected to be asserted against you over the next five years. You say that in light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, you do not believe that you have a reasonable basis for estimating asbestos claims beyond the next five years.
>
> ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied. **Therefore, we do not believe**

> *there is a conceptual basis for limiting an ASC 450 assessment to a certain time horizon. We believe your ASC 450 assessment should consider all claims without limitation to a specific time period.* It is unclear how the ASC 450 assessment was considered for periods outside of the five year time horizons.
>
> *Based on your history with asbestos claims, it seems unlikely to us that the low end of your range of probable losses for time periods beyond five years is zero.* Therefore, please explain in greater detail how you determined that it was not possible to make any estimate for probable losses (including any legal costs for claims where an accrual has already been provided) for periods beyond five years from the date of the financial statements.

(emphasis added)

57. Honeywell and Garrett responded on June 8, 2018. In their response (which was also not made public until October 5, 2018), Honeywell "acknowledges that ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied." [6/8/18 GTX letter at p.6]. It also acknowledges that "epidemiological projections of the incidence of disease extend well beyond a five-year time horizon." *Id*. Honeywell, nonetheless, pointed to potential future scientific research and legal developments as justifying its decision to not accrue the potential liability for asbestos claims after 2022. It stated:

> As a result, and based on liability estimates for future claims developed with the assistance of a third party asbestos expert actuarial firm and outside legal counsel, Honeywell selected a five-year future time horizon as the reasonable basis for valuing possible future claims as we believe that any loss or range of loss for probable asbestos claims beyond the five-year period is not reasonably estimable. In particular:

- Scientific research is demonstrating that brake dust from automotive brakes does not cause disease and that mesothelioma is caused by other factors. Honeywell expects that emerging scientific research with respect to brake linings manufactured with chrysotile asbestos is likely to provide additional evidence that brake dust does not cause mesothelioma.

- Honeywell, along with other defendant companies, continues to pursue aggressive legal strategies to change substantive and procedural standards governing claims related to friction products like brake linings. This effort is primarily focused on strengthening product causation standards applied by the courts in asbestos personal injury cases as causation is a critical element of every asbestos claim. These litigation strategies have resulted in some recent successes as we have seen tort causation requirements changed in several states in recent years (*e.g.,* Pennsylvania, Virginia and Ohio).

A more detailed discussion of both scientific research and litigation strategies can be found below.

While Honeywell recognizes that it is probable that there will be asbestos claims filed against Honeywell and that Honeywell will experience losses beyond the five-year period (i.e., in year six), the inherent uncertainty that has resulted from emerging scientific and medical research and from volatility of legal standards in asbestos cases and rulings that we expect to continue have made it difficult to predict asbestos claim rates, settlement values and dismissal rates or to reasonably estimate any loss amount, or range of loss, for such claims beyond a five-year period.

58.     Honeywell proposed to include additional disclosure explaining its limit of five years for estimating future Bendix asbestos related liability and include an additional risk factor notifying investors that Honeywell "acknowledge[s] that it is probable that there will be losses associated with Bendix claims beyond the five-

year horizon." Honeywell did not, however, state that it was unable to estimate asbestos related liability for periods beyond five years based on existing science and legal standards or why these potentially favorable future developments meant it was more accurate to simply record zero liability for any claims filed after 2022.

59.     The SEC was unimpressed by Honeywell's response and responded on June 21, 2018 asking Honeywell to advise "how and why you determined that a five-year time period to estimate losses for unasserted claims yields reliable estimates but time periods beyond five years cannot be reasonably estimated." The SEC question Honeywell "whether [it] (1) attempted to estimate a liability for potential claims beyond the five year period but concluded the resulting estimate of loss (or range) was not reasonable or (2) did not attempt to estimate a liability beyond the five year period because [it] believed [it] could not develop a reasonable estimate." The SEC's response was not made public until October 5, 2018.

60.     Honeywell and Garrett responded on June 29, 2018 in a further attempt to support its accounting for future Bendix asbestos related liability. Honeywell again pointed to scientific research and its litigation strategy as making "five years a reasonable outer limit for the period of time over which claim rates and claim resolution values would remain unaffected by current scientific developments and litigation activities." In response to whether Honeywell attempted to estimate liability beyond five years, Honeywell stated:

> Honeywell estimates its future liability for asbestos-related claims based upon three significant variables: (a) epidemiological projection of the future incidence of asbestos-related disease; (b) projected claims rates, including number, type and nature of claims filed against Honeywell drawn from Honeywell's recent claims experience; and (c) projected average claim resolution values, by type of claim, drawn from Honeywell's recent claims experience. As described in our response to

Comment 1 above, Honeywell believes that two of the three variables (specifically, (b) and (c) above) cannot be reasonably estimated beyond a five-year period. Notwithstanding this limitation, Honeywell applied variables (b) and (c) to the epidemiological projections in the manner used by Honeywell to calculate estimated losses during the five-year forecasting period spanning 2018-2022. Based on this mathematical extrapolation, such calculation generated an estimated reasonably possible exposure over the full term of the epidemiological projections for potential claims not yet asserted of $1.3 billion as of December 31, 2017.

61.     Honeywell and Garrett's response on June 29, 2018 was not made public until October 5, 2018.

62.     Despite knowing that it had potential exposure to Bendix asbestos related liability of $1.3 billion and that the SEC believed that its prior accounting for this liability did not comply with GAAP, Honeywell filed its quarterly report on July 20, 2018 using its historical accounting methodology and still stating that its future Bendix asbestos liability was $610 million. Honeywell also stated that its financial statements were prepared in accordance with GAAP. Honeywell did not disclose that the SEC did not believe there was a conceptual basis under GAAP for Honeywell's accounting and did not include any of the additional cautionary language that it had proposed to the SEC in its letter dated June 8, 2018. The July 2018 Quarterly Report was also accompanied by SOX certifications signed by CEO Adamczyk and CFO Szlosek certifying that the financial statements were properly stated and disclosed all material weaknesses and significant deficiencies.

63.     On July 25, 2018, representatives of Honeywell and Garrett had a telephone conference with the SEC who followed up with a letter dated July 27, 2018 (which was not made public until October 5, 2018). In that letter, the SEC continued to ask for support for Honeywell's historical accounting for Bendix

asbestos related liability. In addition to requesting accounting memoranda supporting the accounting, the SEC noted that there had been relatively little change in the amount of Bendix liability over the last ten years which contradicted Honeywell's assertion that the dynamic legal and scientific environment made estimates past five years unreliable. Additionally, the SEC noted that according to Honeywell, "a reasonably possible exposure over the full term of the epidemiological projections for Bendix IBNR claims would be $1.3 billion." Therefore, the SEC understood "that this would represent $820 million of reasonably possible additional exposure beyond what is recorded at December 31, 2017, extending over an approximate 30 year period beginning in 2023."

64.     On August 8, 2018, Honeywell and Garrett agreed with the SEC that Honeywell's historical accounting for Bendix asbestos liability was inappropriate and not in accordance with GAAP. Honeywell admitted, it "has determined that it had not appropriately applied the provisions of ASC 450 when measuring its asbestos liabilities related to unasserted Bendix claims." As a result, Garrett was restating its historical financial statements as this was a material error. The effect of the restatement was to increase asbestos related liabilities by approximately $1.1 billion. Honeywell also advised the SEC that "a material weakness in internal control over financial reporting was identified related to a deficiency of internal control for the estimation of probable and reasonably estimable liability for unasserted Bendix-related asbestos claims." Honeywell would also be "revising" its historical financial statements to correct this error as well. In acknowledging the error in its historical financial statements, Honeywell "concluded that the appropriate application of ASC 450 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in its measurement of such liability." This was because there was no "objective and verifiable data" to support limiting the estimate to just a five-year period.

65.     The same day, August 8, 2019, Garrett filed Amendment No. 2 to Form 10 with the SEC restating its financials. In "Note 1. Restatement of Combined Financial Statements" Garrett stated the following:

> In August 2018, the Transportation Systems business ("TS," the "Business," the "Company," "we" or "our") of Honeywell International Inc. ("Honeywell" or the "Parent") determined that it had not appropriately applied the provisions of ASC 450, Contingencies, in measuring its asbestos liabilities related to unasserted Bendix claims (see Note 18 Commitments and Contingencies). The Company now reflects the full term of the epidemiological projections rather than a five-year time horizon when estimating the liability for unasserted Bendix-related asbestos claims.
>
> In light of the foregoing, the Company has restated the financial statements as of and for the years ended December 31, 2017, 2016, and 2015 to reflect the effects of its revised method for estimating its total liability for unasserted Bendix-related asbestos claims and to make certain corresponding disclosures related thereto.
>
> ***
>
> Both we and Honeywell consider the basis on which the expenses have been allocated to be a reasonable reflection of the utilization of services provided to or the benefits received by the Business during the periods presented.

66.     Additionally, Garrett disclosed:

> Our financial statements are derived from the consolidated financial statements and accounting records of Honeywell. In the course of preparing for our Spin-Off from Honeywell, Honeywell reassessed its accounting for unasserted Bendix-related asbestos claims to reflect the full term of the epidemiological projections in its measurement of such liability. This matter also affected our financial statements. As a result of this error, the Company's Combined Financial Statements were restated as described in Note 1, and a material weakness in internal

control over financial reporting was identified related to a deficiency of internal control for the estimation of probable and reasonably estimable liability for unasserted Bendix-related asbestos claims.

Specifically, after assessing the deficiency that allowed the error to occur, and after assessing the materiality of the error to the Company's Combined Financial Statements, it was determined that there were not effective controls in place to provide reasonable assurance that a material error would be prevented or detected related to the application of ASC 450 (Contingencies) in the estimation of such Bendix-related asbestos liability.

To address the material weakness in internal control over financial reporting described above, the Company will implement policies and procedures for the review, approval, and application of generally accepted accounting principles to, and disclosure with respect to, estimating the liability for unasserted Bendix-related asbestos claims.

67.    Additionally, on September 5, 2018, Garrett filed with the SEC Amendment No. 1 to Form 10 relating to its registration of securities. The report of the independent registered public accounting firm notes that "the accompanying financial statements have been restated to correct a misstatement." Garrett elaborated that it had "restated the financial statements as of and for the years ended December 31, 2017, 2016, and 2015 to reflect the effects of its revised method for estimating its total liability for unasserted Bendix-related asbestos claims and to make certain corresponding disclosures related thereto."

68.    On August 14, 2018, the SEC sent a letter to Honeywell relating to its asbestos related liabilities, stating:

We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on

specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO-related asbestos liability. In your response, also please provide us with an analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods.

69.     After just six days, on August 20, 2018, Honeywell responded to the SEC via letter. Honeywell again admitted that its accounting for Bendix related asbestos liability was incorrect, and that it would need to issue a restatement. Honeywell stated, "[u]pon thorough consideration of the Staff's comments in its review of the Form 10 submitted to the Staff in connection with the proposed spin-off of Garrett Motion Inc. and of the application of ASC 450, Honeywell determined that we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims.  Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability.  The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of liability for unasserted Bendix-related asbestos claims."

70.     Honeywell indicated the following:

To again summarize, the error was identified subsequent to the quarter ended June 30, 2018;

- Under the iron curtain method from a balance sheet perspective, the correction of the error is not quantitatively material to the balance sheet because it does not affect any of the Company's key balance sheet metrics, including equity, by more than 4.5%. The cumulative error represents an increase of $65 million

or 15.9% of insurance recoveries, but these amounts are not significant in view of total assets of $59,860 million (an increase of approximately 0.1%). The cumulative error represents an increase of $1,083 million or 91.9% of asbestos related liabilities, but this is non-current in nature and not significant when viewed in relationship to total liabilities of $42,087 million (an increase of 2.6%). It also impacts net deferred tax liabilities by $248 million or 9.0%, but this is also not significant when viewed in relationship to total liabilities of $42,087 million (a decrease of 0.6%). The cumulative error therefore impacts equity by $770 million on an equity balance of $17,773 million (a decrease of approximately 4.4%).

- Under the iron curtain method, the effects of a cumulative correction on the Company's projected 2018 income statement, however, would be material. For instance, the impact of correcting the error in 2018 would be a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net income. This would represent a greater than 10% impact on both of the forecasted 2018 amounts. Accordingly, we have concluded that the error cannot be corrected through the 2018 income statement and must, therefore be corrected via a revision of prior periods.

- In order to assess whether the revision for this error represents a material restatement or immaterial restatement (i.e. revision), we utilized the rollover method to quantify the amount by which each affected income statement and statement of cash flows in the last five years was actually misstated, and quarterly periods for the latest two years. Additionally, as part of this analysis, we calculated the cumulative effect of the uncorrected error on the balance sheets at the end of each such period. The rollover method analysis indicates that the restatement is not quantitatively material because the effects of the error on the misstated income statements, statements of cash flows

and balance sheets of those prior periods is less than 5% of all key metrics in each period, with the exception of net income (-6.5%) and comprehensive income (-5.0%) for the year ended December 31, 2017. This was primarily due to an increase in the Company's tax provision as a result of US Tax Reform enacted in December 2017. The impact of US Tax Reform was considered unusual and infrequent in nature, and furthermore, the Company has disclosed the effects of tax reform through its earnings releases and periodic financial statements. Excluding the impact of US Tax Reform, the impact of the error on our 2017 net income is $27 million or 0.5%. This error also had no overall impact on cash flows from operations.

71.     Under Section 2 – Sox 404 Internal Control Assessment, Honeywell stated:

As indicated previously, in August 2018, management concluded it should adjust the Bendix asbestos liability to reflect the full term of the epidemiological projections through 2059, and therefore, determined that it had historically incorrectly applied the provisions of ASC 450, Contingencies, in measuring its Bendix asbestos liability related to unasserted claims. This error, and the related control deficiency, were identified during the course of the SEC Staff's review of the Form 10 filing related to Garrett Motion Inc.

Our conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), (ii) noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies (again because of such time horizon subjectivity), and (iii) concluding that such an adjustment would facilitate comparability between Honeywell, Garrett Motion Inc., and the companies' respective peers. Therefore, with the assistance of an external specialist, and utilizing a model with actuarial inputs, Honeywell has and

25

will continue in the future to consider the full term of epidemiological projections of future incidents of asbestos-related disease to estimate its probable and reasonably estimable Bendix asbestos-related liability. ***

*Control Identified*

The error that was identified is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted.

As noted in the summary of the accounting process for unasserted claims above, we use a third-party specialist to assist in assessing the required Bendix unasserted claims liability. The Company has designed a relevant internal control over that process. We identified an operating effectiveness deficiency related to that internal control activity. The specific control activity is the "Bendix Reserves True-up" control, which states that "…Honeywell's third-party service provider calculates the average resolution values on which Honeywell bases its estimates of the total liability associated with its current and future Bendix asbestos claims. The year-end reserve is updated based on the new average resolution values and is approved by Management." This key control is specific to Bendix-related asbestos reserves where, on an annual basis, the Bendix-related asbestos reserves are adjusted to properly reflect current year estimates regarding both resolution values and estimated future claimants based on anticipated changes in the population of claims. Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions. Management has historically, as part of

this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims.  Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

This control focuses on the analysis and validation of the Bendix asbestos unasserted claims liability. Rights and obligation and valuation and allocation assertions are the relevant assertions that the control addresses.
***
Therefore, as part of the operation of the identified deficient Bendix control, a review of the conclusion on the unasserted claims liability occurred in connection with the data analysis and specialist report. However, in connection with the performance of this control, the Company inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence.

72.    As a result, Honeywell "concluded it was appropriate to revise prior periods when correcting the error under SAB 99. This consideration implies that there was information available that should have caused us to modify the time horizon used for the Bendix unasserted claims liability at an earlier point. The specific time horizon is subjective in nature given the assessment of all available information."

73.     On August 23, 2018 Honeywell announced to the public that the SEC's comments that were given to Garrett "are also applicable to Honeywell's historical financial statements." Therefore, Honeywell announced that it corrected its accounting related to the time horizon for estimating future Bendix asbestos liabilities following a review by the SEC's Division of Corporation Finance. Attached to the August 23, 2018 Form 8-K as Exhibit 99, Honeywell attached restated financial statements indicating an additional $1.083 billion in asbestos-related liabilities.

74.     On September 9, 2018 the Division of Corporation Finance informed the company that this review had been closed.

75.     On October 19, 2018 in the Q3'18 10-Q, Honeywell disclosed that the SEC's Division of Corporation Finance had reviewed Honeywell's prior accounting for liability for unasserted Bendix-related asbestos claims and that "[o]n September 13, 2018, following completion of Corporation Finance's review, the SEC Division of Enforcement advised that it has opened an investigation related to this matter."

76.     Accordingly, Honeywell did not comply with ASC 450 in determining to use a limited five year time period.

**E.     Honeywell's Control Deficiency.**

77.     A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.

78.     Honeywell determined that should adjust the Bendix asbestos liability to reflect the full term of the epidemiological projections through 2059, and therefore, determined that it had historically incorrectly applied the provisions of ASC 450, *Contingencies*, in measuring its Bendix asbestos liability related to unasserted claims.

79. Honeywell stated that this error "is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted."

80. As described above in the summary of the accounting process for unasserted claims, Honeywell uses a third-party specialist to assist in assessing the required Bendix unasserted claims liability. In connection with the third-party specialist, Honeywell has designed a relevant internal control over that process that focuses on the analysis and validation of the Bendix asbestos unasserted claims liability.

81. The specific control activity is the "Bendix Reserves True-up" control, which states that "…Honeywell's third-party service provider calculates the average resolution values on which Honeywell bases its estimates of the total liability associated with its current and future Bendix asbestos claims. The year-end reserve is updated based on the new average resolution values and is approved by Management."

82. This control is specific to Bendix-related asbestos reserves where, on an annual basis, the Bendix- related asbestos reserves are adjusted to properly reflect current year estimates regarding both resolution values and estimated future claimants based on anticipated changes in the population of claims.

83. Management is highly involved in this internal control and has direct impact on the accounting of Bendix's asbestos liability. Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos-related claims is also included in those discussions.

84.     Management has historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims.  Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

85.     Honeywell admitted that it had identified an operating effectiveness deficiency related to this internal control activity.

86.     As part of the operation of the identified deficient Bendix control, a review of the conclusion on the unasserted claims liability occurred in connection with the data analysis and specialist report.

87.     Honeywell found that in connection with the performance of this control, Honeywell inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon.

88.     Honeywell under-reported its liability based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon.

89.     Additionally, Honeywell did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence.

90.     Honeywell also had conversations between management, its third-party specialists and outside counsel about what appeared to be a movement of companies to extend out the time horizon.

91.     These considerations were part of the Bendix control previously discussed. As such, Honeywell had a deficiency in its controls.

**F.     Management's Responsibility for Financial Reporting.**

92.     Defendants represented in each of Honeywell's periodic reports filed with the SEC on Forms 10-K and 10-Q that the financial statements therein conformed with GAAP.

93.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). Effective July 1, 2009, the FASB issued the FASB ASC which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards. The ASC is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC, Topic 105, Sub-topic 10, § 5, ¶ 1.)

94.     SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

95.     Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by the American Institute of Certified Public Accounts states in pertinent part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control

structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).)

96.     Section 13 of the Exchange Act confirms management's responsibilities for an entity's internal controls. "Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . . ." (15 U.S.C. § 77m(b)(2)(B)(ii)(I).)

97.     Honeywell's management, including its CEO and CFO, conducted evaluations of the effectiveness of Honeywell's internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Report"). The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes are fairly presented in conformity with GAAP and regulatory requirements.

Inherent in the fair presentation of financial statements is the concept of statement materiality. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

98.    An error in previously issued financial statements is an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared." A "retrospective application" is the "application of a different accounting principle to one or more previously issued financial statements . . . ." A "restatement" is the "process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC, Topic 250, Sub-topic 10, § 20.)

99.    Upon the discovery of an error in a previously issued financial statement, the "error . . . shall be reported as an error correction[] by restating the prior-period financial statements. Restatement requires all of the following: [a] The cumulative effect on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented[;] [b] An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period[;] [and] [c] Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period- Upon restating financial statements for the purpose of correcting an error, "the entity shall disclose that its previously issued financial statements have been restated, along with a description of the nature of the error. The entity also shall disclose both of the following: [a] The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented [and] [b] The

cumulative effect of the change on retained earnings or other appropriate components of equity or net assets in the statement of financial position . . . ." (ASC, Topic 250, Sub-topic 10, § 50, ¶ 7.) specific effects of the error." (ASC, Topic 250, Sub-topic 10, § 45, ¶ 23.) Other circumstances requiring the revision of financial statements, neither of which are applicable here, include a change in the reporting entity or a change in an accounting principle. (ASC, Topic 250, Sub-topic 10, § 45.)

100.   Upon restating financial statements for the purpose of correcting an error, "the entity shall disclose that its previously issued financial statements have been restated, along with a description of the nature of the error. The entity also shall disclose both of the following: [a] The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented [and] [b] The cumulative effect of the change on retained earnings or other appropriate components of equity or net assets in the statement of financial position . . . ." (ASC, Topic 250, Sub-topic 10, § 50, ¶ 7.)

101.   Restating financial statements dilute public confidence in the companies to which they belong. Further, restatements confuse those who use them. Consequently, financial statements prepared in accordance with GAAP should be considered final, and only restated for the purpose of correcting material errors. (ASC, Topic 105, Sub-topic 10, § 5, ¶ 6.)

102.   As a result of Honeywell's improper accounting Honeywell concluded it had a "significant deficiency" in internal controls over financial reporting and that it would need to restate prior periods.

103.   Specifically, Honeywell found that the effects of a cumulative correction on Honeywell's projected 2018 income statement, would be material. Honeywell determined that the impact of correcting the error in 2018 would be a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net

income. This would represent a greater than 10% impact on both of the forecasted 2018 amounts.

104.   Honeywell calculated the cumulative effect of the uncorrected error on the balance sheets and determined that the error would have a -6.5% effect on net income and a -5% on comprehensive income for the year ended December 31, 2017.

105.   Accordingly, Honeywell concluded that the error cannot be corrected through the 2018 income statement and must, therefore be corrected via a revision of prior periods.

106.   Honeywell also determined that it was appropriate to revise prior periods when correcting the error under SAB 99. Honeywell admits that this consideration implies that there was information available that should have caused Honeywell to modify the time horizon used for the Bendix unasserted claims liability during those prior periods.

107.   Honeywell restated its estimate for asbestos liability claims in the third quarter of 2018 in relation to the SEC's corporation finance division review of the company's annual report for 2017. That report included Honeywell's accounting for legacy asbestos claims from its former Bendix business

108.   Honeywell's new estimate for its asbestos-related liabilities, as of Dec. 31, 2017, projects out to 2059 and is $2.61 billion, $1.087 billion higher than Honeywell's prior estimate, solely due to an increase in Bendix liability.

109.   Additionally, Honeywell's insurance recoveries for asbestos-related liabilities were raised to $503 million, as of December 31, 2017, $68 million higher than its previous estimate.

## G.   Honeywell's Competitors Accounted for the Full-Term Asbestos Related Liabilities.

110.   Honeywell's decision to use a five year horizon was also at odds with and contrary to industry practices, as evidenced by the accounting practices of other

companies with asbestos-related litigation exposure. Indeed, as stated in the appendix to Honeywell's August 20, 2018 response to the SEC, its "conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), [and] (ii) noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies (again because of such time horizon subjectivity) . . . . The Company also had conversations between management [Adamczyk and Szlosek], its third-party specialists and outside counsel about what appeared to be a movement of companies to extend out the time horizon."

111.   Honeywell even admits that adjusting the time horizon of the Bendix liability "would facilitate comparability between Honeywell, Garrett Motion Inc., and the companies' respective peers."

112.   In The Dow Chemical Company's Form 10-K for the year ending December 31, 2016, The Dow Chemical Company's subsidiary, Union Carbide, "increased its December 31, 2002 asbestos-related liability for pending and future claims for a 15-year period ending in 2017 to $2.2 billion, excluding future defense and processing costs." Union Carbide studied "both a 15 year period and through the terminal year of 2049." Union Carbide "determined that using the estimate through the terminal year of 2049 was more appropriate due to increasing knowledge and data about the costs to resolve claims and diminished volatility in filing rates."

113.   Similarly, in May 2016, Owens-Illinois, Inc. revised its accounting for asbestos related liability from fours years out until an indefinite period of time into the future. Owens-Illinois, Inc. noted, "Beginning in 2003, the Company has estimated its asbestos-related liability based on an annual analysis of how far in the future it could reasonably estimate the number of claims it expected to receive. Subsequent to the filing of its 2015 Annual Report, the Company was informed by

36

the SEC staff that they believe that, under the applicable accounting pronouncement, the Company should consider all claims without limitation to a specific time period. In light of these discussions, the Company has concluded, in consultation with the Audit Committee and the Company's independent registered public accounting firm Ernst & Young LLP ("EY"), that its method for estimating its future asbestos-related liability was not consistent with the applicable accounting pronouncement. With the assistance of an external consultant, and utilizing a model with actuarial inputs, the Company has developed a new method for reasonably estimating its total asbestos-related liability. Using the new model, the Company's total asbestos-related liability, without limitation to a specific time period, is expected to be $806 million as of March 31, 2016. This is $295 million higher than the estimation method used previously that used a four year future period."

114.   In 2016, Crown Holdings, Inc. changed its accounting for asbestos related liabilities. Previously, Crown Holdings, Inc. "estimated probable costs for claims through the year 2025." However, beginning in Crown Holdings, Inc. Form 10-K for year-end 2016, Crown Holdings began accounting for asbestos-related liabilities "without limitation to a specified time period."

115.   In 2007, Ingersoll-Rand changed its accounting under ASC 450 for asbestos-related liabilities from seven years into the future out until 2053, "the period over which the Company has and is likely to resolve asbestos-related claims against it in the future." Ingersoll-Rand notes that "[i]n the fourth quarter of 2007, the Company again reviewed its history and experience with asbestos-related litigation and determined that it had now become possible to make a reasonable estimate of its total liability for pending and unasserted potential future asbestos-related claims. This determination was based upon the Company's analysis of developments in asbestos litigation, including the substantial and continuing decline in the filing of non-malignancy claims against the Company, the establishment in

many jurisdictions of inactive or deferral dockets for such claims, the decreased value of non-malignancy claims because of changes in the legal and judicial treatment of such claims, increasing focus of the asbestos litigation upon malignancy claims, primarily those involving mesothelioma, a cancer with a known historical and predictable future annual incidence rate, and the Company's substantial accumulated experience with respect to the resolution of malignancy claims, particularly mesothelioma claims, filed against it."

116.   Since 2007, the 3M Company has projected its asbestos-related liability out based on the amount of future projected claims for an indefinite period of time into the future. The 3M Company explains, that it "estimates its respirator mask/asbestos liabilities, including the cost to resolve the claims and defense costs, by examining: (i) the Company's experience in resolving claims, (ii) apparent trends, (iii) the apparent quality of claims (e.g., whether the claim has been asserted on behalf of asymptomatic claimants), (iv) changes in the nature and mix of claims (e.g., the proportion of claims asserting usage of the Company's mask or respirator products and alleging exposure to each of asbestos, silica, coal or other occupational dusts, and claims pleading use of asbestos-containing products allegedly manufactured by the Company), (v) *the number of current claims and a projection of the number of future asbestos and other claims that may be filed against the Company*, (vi) the cost to resolve recently settled claims, and (vii) an estimate of the cost to resolve and defend against current and future claims."

## H.   Honeywell Made Materially False and Misleading Statements.

117.   Throughout the Class Period, Defendants made materially false and misleading statements regarding the company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Honeywell's Bendix asbestos-related liability was greater than initially reported; (ii) Honeywell maintained improper

accounting practices and controls over financial reporting and public disclosures in connection with its Bendix asbestos-related liability; and (iii) as a result, Honeywell's public statements were materially false and misleading at all relevant times.

*February 9, 2018 Form 10-K*

118.   On February 9, 2018, the start of the Class Period, Honeywell filed an annual report on Form 10-K with the SEC, announcing its financial and operating results for the quarter and year ended December 31, 2017. Adamczyk and Szlosek signed the 2017 10-K on behalf of Honeywell.

119.   The 2017 10-K contained a series of "Notes" to its consolidated financial statements. Note 19, titled "Commitments and Contingencies," discussed the company's asbestos-related liabilities. Within Note 19, Honeywell represented that its total Bendix asbestos-related liability was as of December 31, 2017 was $616 million. This representation was false and materially misleading because Honeywell's true Bendix asbestos-related liability as of December 31, 2017 was $1.703 billion, nearly three times more than the amount represented.

120.   The representation was also false and materially misleading because it stated that Honeywell was complying with generally accepted accounting principles and various accounting standards, namely ASC 450, in calculating this figure. It was not. Honeywell was, in fact, not adhering to ASC 450 or, for that matter, industry norms. Instead of estimating its Bendix asbestos-related liability to account for the full term of the epidemiological studies, Honeywell was cutting off its estimates after five years, thus disregarding any potential for liability from that point forward. Honeywell provided its $616 million estimate without any warning that the estimate was unsupported by, contrary to, and in violation of applicable accounting standards.

121.   Within Note 19, Honeywell also provided investors with a description of its method for determining the company's Bendix asbestos-related liability. In pertinent part, the 2017 Form 10-K stated:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. ***In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.*** The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

122.   This statement was materially false and misleading. Honeywell knew that it was able to "estimat[e] asbestos claims beyond the next five years," but intentionally decided not to do so. After the SEC's Division of Corporation Finance sent Honeywell its August 14, 2018 letter, Honeywell quickly changed its accounting methods to conform with ACS 450 and began estimating its Bendix asbestos-related liability to account for the full term of the epidemiological studies. Thus, Honeywell, Adamczyk, and Szlosek lied when they told investors that the

company did not have the ability to estimate Bendix-related liabilities for a period greater than five years in the future.

123.    The 2017 10-K also indicates that Honeywell had net income of $1.655 billion attributed to Honeywell and comprehensive income of $2.177 billion. However, unbeknownst to investors this number was false and misleading as Honeywell had actually inflated its net income by 6.5% and comprehensive income by 5% by limiting asbestos liability to just five years. In other words, had Honeywell properly accounted for its $1.703 billion of Bendix asbestos-related liability, the company's net income and comprehensive income would have been decreased by 6.5% and 5%, respectively.

124.    In connection with Honeywell's 2017 10-K, Adamczyk and Szlosek each certified pursuant to the Sarbanes-Oxley Act of 2002 that they reviewed the 2017 10-K. Specifically, Adamczyk and Szlosek each certified that:

> 1.  I have reviewed this Annual Report on Form 10-K of Honeywell International Inc.;
>
> 2.  Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3.  Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;
>
> 4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure

controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

    b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

125. Adamczyk's and Szlosek's certifications were false and/or materially misleading because the 2017 10-K in fact did not "fairly present in all material respects the financial condition." As alleged previously, Honeywell's Bendix asbestos-related liability was not $616 million, but instead nearly three times as much, $1.703 billion, as of December 31, 2017. Moreover, contrary to Adamczyk's and Szlosek's claims in the certifications that they had "designed such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting," they developed controls that systematically manipulated the company's accounting for Bendix asbestos-related liability. As confirmed by Honeywell's August 20, 2018 response to the SEC, Adamczyk and Szlosek were deeply involved in the accounting for and controls over the Bendix asbestos-related liability. These controls, according to Honeywell, were designed to ignore potential liability outside of a five-year period into the future and, therefore,

violated generally accepted accounting principles. Accordingly, Adamczyk's and Szlosek's certifications were knowingly false at the time they were signed.

126.   The omissions and/or misrepresentations in the 2017 10-K were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

*April 20, 2018 Form 10-Q*

127.   On April 20, 2018, Honeywell filed a quarterly report on Form 10-Q with the SEC, announcing the company's financial and operating results for the first quarter of 2018 (the "Q1'18 10-Q").  Jennifer H. Mak signed the Q1'18 10-Q on behalf of Honeywell.

128.   The Q1'18 10-Q contained a series of "Notes" to its consolidated financial statements. Note 14, titled "Commitments and Contingencies," discussed the company's asbestos-related liabilities. Within Note 14, Honeywell represented that its total Bendix asbestos-related liability was as of December 31, 2017 was $616 million and as of March 31, 2018 was $615 million. This representation was false and materially misleading because Honeywell's true Bendix asbestos-related liability as of December 31, 2017 was $1.703 billion, nearly three times more than the amount represented.

129.   The representation was also false and materially misleading because it stated that Honeywell was complying with generally accepted accounting principles and various accounting standards, namely ASC 450, in calculating this figure. It was not. Honeywell was, in fact, not adhering to ASC 450 or, for that matter, industry norms. Instead of estimating its Bendix asbestos-related liability to account for the full term of the epidemiological studies, Honeywell was cutting off its estimates after five years, thus disregarding any potential for liability from that point forward. Honeywell provided its Bendix asbestos-related liability estimate without any

44

warning that the estimate was unsupported by, contrary to, and in violation of applicable accounting standards.

130.   Within Note 14, Honeywell also provided investors with a description of its method for determining the company's Bendix asbestos-related liability. In pertinent part, the Q1'18 10-Q stated:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. ***In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.*** The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

131.   This statement was materially false and misleading. Honeywell knew that it was able to "estimat[e] asbestos claims beyond the next five years," but intentionally decided not to do so. After the SEC's Division of Corporation Finance sent Honeywell its August 14, 2018 letter, Honeywell quickly changed its

accounting methods to conform with ACS 450 and began estimating its Bendix asbestos-related liability to account for the full term of the epidemiological studies. Thus, Honeywell, Adamczyk, and Szlosek lied when they told investors that the company did not have the ability to estimate Bendix-related liabilities for a period greater than five years in the future.

132.    In connection with Honeywell's Q1'18 10-Q, Defendants Adamczyk and Szlosek each certified pursuant to SOX that they reviewed the Q1'18 10-Q. Specifically, Adamczyk and Szlosek each certified that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Honeywell International Inc.;

2.  Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.  Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting princip*les**;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the

registrant's board of directors (or persons performing the equivalent functions):

    a) ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

    b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

133. Adamczyk's and Szlosek's certifications were false and/or materially misleading because the Q1'18 10-Q in fact did not "fairly present in all material respects the financial condition." As alleged previously, Honeywell's Bendix asbestos-related liability was not $616 million, but instead nearly three times as much, $1.703 billion, as of December 31, 2017. Moreover, contrary to Adamczyk's and Szlosek's claims in the certifications that they had "designed such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting," they developed controls that systematically manipulated the company's accounting for Bendix asbestos-related liability. As confirmed by Honeywell's August 20, 2018 response to the SEC, Adamczyk and Szlosek were deeply involved in the accounting for and controls over the Bendix asbestos-related liability. These controls, according to Honeywell, were designed to ignore potential liability outside of a five-year period into the future and, therefore, violated generally accepted accounting principles. Accordingly, Adamczyk's and Szlosek's certifications were knowingly false at the time they were signed.

134.   The omissions and/or misrepresentations in the Q1'18 10-Q were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

*July 20, 2018 Form 10-Q*

135.   On July 20, 2018, Honeywell filed a quarterly report on Form 10-Q with the SEC, announcing the company's financial and operating results for the second quarter of 2018 (the "Q2'18 10-Q"). John J. Tus signed the Q2'18 10-Q on behalf of Honeywell.

136.   The Q2'18 10-Q contained a series of "Notes" to its consolidated financial statements. Note 15, titled "Commitments and Contingencies," discussed the company's asbestos-related liabilities. Within Note 15, Honeywell represented that its total Bendix asbestos-related liability was as of December 31, 2017 was $616 million and as of June 30, 2018 was $610 million. This representation was false and materially misleading because Honeywell's true Bendix asbestos-related liability as of December 31, 2017 was $1.703 billion, nearly three times more than the amount represented.

137.   The representation was also false and materially misleading because it stated that Honeywell was complying with generally accepted accounting principles and various accounting standards, namely ASC 450, in calculating this figure. It was not. Honeywell was, in fact, not adhering to ASC 450 or, for that matter, industry norms. Instead of estimating its Bendix asbestos-related liability to account for the full term of the epidemiological studies, Honeywell was cutting off its estimates after five years, thus disregarding any potential for liability from that point forward. Honeywell provided its Bendix asbestos-related liability estimate without any warning that the estimate was unsupported by, contrary to, and in violation of applicable accounting standards.

138.   Within Note 15, Honeywell also provided investors with a description of its method for determining the company's Bendix asbestos-related liability. In pertinent part, the Q1'18 10-Q stated:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. *In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.* The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

139.   This statement was materially false and misleading. Honeywell knew that it was able to "estimat[e] asbestos claims beyond the next five years," but intentionally decided not to do so. After the SEC's Division of Corporation Finance sent Honeywell its August 14, 2018 letter, Honeywell quickly changed its accounting methods to conform with ACS 450 and began estimating its Bendix asbestos-related liability to account for the full term of the epidemiological studies.

Thus, Honeywell, Adamczyk, and Szlosek lied when they told investors that the company did not have the ability to estimate Bendix-related liabilities for a period greater than five years in the future.

140.   In connection with Honeywell's Q2'18 10-Q, Defendants Adamczyk and Szlosek each certified pursuant to SOX that they reviewed the Q2'18 10-Q. Specifically, Adamczyk and Szlosek each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Honeywell International Inc.;

2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3. Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant,

including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) *designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting princip***les**;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) *all significant deficiencies and material weaknesses in the design or operation of internal control over*

> *financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and
>
> **b)** *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

141. Adamczyk's and Szlosek's certifications were false and/or materially misleading because the Q2'18 10-Q in fact did not "fairly present in all material respects the financial condition." As alleged previously, Honeywell's Bendix asbestos-related liability was not $616 million, but instead nearly three times as much, $1.703 billion, as of December 31, 2017. Moreover, contrary to Adamczyk's and Szlosek's claims in the certifications that they had "designed such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting," they developed controls that systematically manipulated the company's accounting for Bendix asbestos-related liability. As confirmed by Honeywell's August 20, 2018 response to the SEC, Adamczyk and Szlosek were deeply involved in the accounting for and controls over the Bendix asbestos-related liability. These controls, according to Honeywell, were designed to ignore potential liability outside of a five-year period into the future and, therefore, violated generally accepted accounting principles. Accordingly, Adamczyk's and Szlosek's certifications were knowingly false at the time they were signed.

142. Honeywell's representation concerning its Bendix asbestos-related liability, description of its method for determining the company's Bendix asbestos-related liability, and certifications pursuant to SOX (as identified in the immediately preceding paragraphs) were also materially misleading because they contradicted and omitted the directions Honeywell had received from the SEC Division of

Corporation Finance on May 24, 2018 and June 21, 2018. In correspondence written to Su Ping Lu, Honeywell's Assistant General Counsel and Assistant Corporate Secretary who was also acting as director for Garrett pre-spin off, the SEC stated that Honeywell's accounting for Bendix asbestos-related liabilities did not comply with GAAP and, in particular, ASC 450. In pertinent part, the SEC wrote "***we do not believe there is a conceptual basis for limiting an ASC 450 assessment to a certain time horizon. We believe your ASC 450 assessment should consider all claims without limitation to a specific time period.***" Honeywell's responses to the correspondence from the SEC confirm that it knew that the company had not been complying with ASC 450 and that it had not provided investors with a complete and accurate description of its Bendix asbestos-related liabilities (despite its ability and requirement to do so).

143.   The Q2'18 10-Q was also materially misleading because it omitted and/or concealed that Honeywell had received correspondence from the SEC's Division of Corporation Finance requiring the company to explain or restate its Bendix asbestos-related liabilities and/or that the SEC was contemplating an investigation or legal proceeding.

144.   Pursuant to Item 103 of Regulation S-K (17 CFR § 229.103), Honeywell was required to describe "material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which [it] or any of its subsidiaries [was] a party or of which any of their property is the subject." Item 103 requires disclosure of "the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought." Item 303 also requires companies to "[i]nclude similar information as to any such proceedings known to be contemplated by governmental authorities."

145.   The correspondence by and between Honeywell and the SEC prior to the Q2'18 10-Q demonstrates that the SEC was contemplating a proceeding against Honeywell. Therefore, pursuant to Item 103 and because of the materiality of the information required to be disclosed under Item 103, Honeywell's Q2'18 10-Q was materially misleading.

146.   The omissions and/or misrepresentations in the Q2'18 10-Q were material because the true facts would have altered the total mix of information available to investors when deciding to purchase Honeywell stock.

## I.   The Truth Emerges Through Partial Corrective Disclosures.

### *August 23, 2018 Form 8-K*

147.   On August 23, 2018, Honeywell issued a press release, which was attached as Exhibit 99 to a Form 8-K filed with the SEC that same day. Honeywell disclosed that it was required to revise its method for estimating its liability for unasserted Bendix asbestos-related claims by considering the epidemiological projections through 2059 of future incidence of Bendix asbestos-related disease.

148.   The August 23, 2018 Form 8-K states in pertinent part:

> During the course of the Securities and Exchange Commission (SEC) review of the Form 10 filing for the planned spin-off of its Transportation Systems business, Garrett Motion Inc. ("Garrett"), Honeywell International Inc. ("Honeywell", the "Company" or "We") has been engaged in discussions with the staff of the SEC (the "Staff") regarding Garrett's accounting for its liability for unasserted Bendix-related asbestos claims and, in conjunction therewith, reviewed the accounting treatment of its legacy Bendix asbestos liabilities. The Staff's comments related to Garrett's accounting in this area are also applicable to Honeywell's historical financial statements.

Following these discussions, ***the Company revised its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims in accordance with Accounting Standards Codification 450, Contingencies ("ASC 450").*** The prior accounting treatment, disclosed in our footnotes to our historical financial statements, applied a five-year time horizon; the revised treatment ***reflects the full term of epidemiological projections through 2059***. The change was made in consideration of a number of factors, ***including the subjective nature of applying a five-year or any other fixed time horizon when estimating liability for unasserted claims, recent changes by several other registrants to accrue for unasserted asbestos claims over the full term of the epidemiological projections and the desire to facilitate comparability among Honeywell, Garrett and their respective peers***.

Our consolidated balance sheets, consolidated statements of operations, consolidated statements of comprehensive income, consolidated statements of shareholders' equity, and consolidated statements of cash flows relative to prior periods will be immaterially revised to correct the Company's application of ASC 450 with respect to Bendix-related asbestos liabilities.

149.    Attached to the August 23, 2018 Form 8-K as Exhibit 99, Honeywell attached restated financial statements indicating an additional $1.083 billion in asbestos-related liabilities.

150.    The August 23, 2018 Form 8-K Exhibit 99 states:

**Asbestos Matters**

The Company has revised its method for reasonably estimating its liability for unasserted Bendix asbestos-related claims by considering the epidemiological projections through 2059 of future incidence of Bendix asbestos-related disease. Using this method, ***the***

> ***Company's Bendix asbestos-related liability is estimated
> to be $1,693 million as of June 30, 2018***. This is $1,083
> million higher than the Company's prior estimation which
> applied a five-year horizon when estimating the liability
> for unasserted Bendix asbestos-related claims. The Bendix
> asbestos-related insurance assets are estimated to be $187
> million as of June 30, 2018, which is $65 million higher
> than the Company's prior estimate.

151.   As a result, the company's prior reported financials underestimated its
asbestos-related liability attributable to Bendix by over $1 billion. Additionally,
Honeywell disclosed that net income attributable to Honeywell for 2017 was
actually $1.545 billion, not the previously reported $1.655 billion.

152.   The above information partially revealed that: (1) Honeywell had been
improperly accounting for Bendix's asbestos-related liabilities; (2) Honeywell's true
Bendix asbestos-related liability was significantly greater than previously
represented; (3) that Honeywell could in fact estimate Bendix asbestos-related
liability for periods greater than five years in the future, contrary to what Honeywell
told investors previously; (4) that Honeywell's previous accounting methodology
was contrary to, and in violation of, ASC 450; and (5) that Honeywell's internal
controls over financial accounting and public disclosures were not designed and/or
working properly, as claimed by Adamczyk and Szlosek in their certifications
pursuant to the Sarbanes-Oxley Act of 2002.

153.   Despite the disclosures in the August 23, 2018 Form 8-K, Honeywell
continued to conceal the truth from investors. Neither the Form 8-K nor the
accompanying exhibit fully disclosed: (1) management's involvement in and
responsibility for estimating Bendix asbestos-related liabilities; (2) that the
accounting process and controls for estimating Bendix asbestos-related liabilities
involved an intentional decision to ignore liabilities potentially arising more than
five years into the future; or (3) that Defendants knew that the accounting process

used for estimating Bendix asbestos-related liabilities was in violation of ASC 450, generally accepted accounting principles, and industry norms. Moreover, Honeywell did not disclose, but instead concealed, that its decision to change its accounting processes for Bendix liabilities was brought about by communication with the SEC's Division of Corporation Finance, *i.e.*, the August 14 and 20, 2018 correspondence.

*October 10, 2018 Form 8-K*

154.   On October 10, 2018, the SEC made public correspondence between the company and its Division of Corporation Finance dated August 14 and 20, 2018. Although released to the public on October 10, 2018, it appeared retroactively on the SEC's website and, consequently, below several more recent filings from Honeywell. In its letter dated August 14, 2018, the SEC stated in pertinent part:

> Form 10-K for Fiscal Year Ended December 31, 2017
> Note 19. Commitments and Contingencies
> Asbestos Matters, page 69
>
> 1. We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO-related asbestos liability. In your response, also please provide us with an analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods. To the extent you determine that the specific future time periods used were incorrect, please provide us with a materiality analysis and your assessment of whether there was a material weakness in internal controls over financial reporting.
>
> We remind you that the company and its management are responsible for the accuracy and adequacy of their

disclosures, notwithstanding any review, comments, action or absence of action by the staff.

155.   On August 20, 2018, John Tus, Honeywell's Vice President and Controller, responded to the SEC via letter, stating in pertinent part:

> We have used different methodologies for estimating asbestos-related liabilities for Bendix and for the NARCO Trust due to the significant distinctions in claims data and histories between the two sets of asbestos-related liabilities. Due to the inherent complexities of modeling numerous layers of uncertain inputs, Honeywell continues to believe that it is critical to retain outside asbestos liability valuation expertise to support our preparation of liability estimates. The fundamental difference between estimating liability for Bendix and the NARCO Trust is the availability of a robust quantity and quality of information (or in the NARCO Trust case, the lack thereof) that has been available for us to use when attempting to make reasonable estimates of our contingent liability. This is critical to understanding why we have used different methods to determine our reasonable estimates, for ASC 450-20 purposes, of our Bendix-related asbestos and NARCO Trust-related asbestos liabilities. We outline below the facts and circumstances behind each of Bendix and the NARCO Trust to clearly differentiate the two and to explain why we have handled the accounting estimates in two different ways. As described in more detail below and in the Appendices hereto, **we are proposing to change our accounting treatment for Bendix asbestos-related liabilities to a terminal value time horizon.** We also discuss our materiality analysis related to that revision and our conclusion that the revision we intend to make does not indicate a material weakness in our internal control over financial reporting. For NARCO Trust asbestos-related liabilities, we believe based on the absence of reliable claims data that our current projection of liability is correct as it is the best available estimate and have described in

detail our process and position based on the available facts.

\* \* \*

For Bendix, we believe that the accrual after the change to a terminal value horizon is appropriate as it is probable and reasonably estimable given the quality and quantity of reliable claims data in the tort system.

\* \* \*

**Bendix**

***Upon thorough consideration of the Staff's comments*** in its review of the Form 10 submitted to the Staff in connection with the proposed spin-off of Garrett Motion Inc. and of the application of ASC 450, ***Honeywell determined that we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims***. Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability. The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of liability for unasserted Bendix-related asbestos claims.

It is important to note that, unlike the NARCO Trust, Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical claims information on which to rely when estimating a future projection of liability. Each year, we have a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support reliable estimates. ***The robustness of this data supported our conclusion that application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450***.

156.   The above statements revealed to the market that Honeywell's accounting for Bendix asbestos-related liabilities was false. Specifically, this revealed that Honeywell did in fact have data to support accounting for the full term, not just a five year horizon.

157.   Incorporated to Honeywell's letter to the SEC was Appendix A that contained additional disclosures relating to Honeywell's prior improper accounting. Appendix A states in pertinent part:

> Additionally, management has evaluated the circumstances around the Bendix asbestos liability error detailed above to determine whether it is an indicator of a material weakness in financial reporting controls. Based on the quantitative and qualitative considerations discussed below *we concluded we have a significant deficiency and not a material weakness in internal controls over financial reporting related to our determination of the time horizon for the Bendix-related asbestos liability.* Therefore, we did not alter our conclusion as to the effectiveness of internal control over financial reporting as of December 31, 2017, from those disclosed within our December 31, 2017 Annual Report on Form 10-K.

158.   This revealed to the market that Honeywell had a significant deficiency it its internal controls over financial reporting and as a result, the accounting for Bendix asbestos-related liabilities, as well as Defendants SOX certifications were false.

159.   Appendix A continued, discussing the accounting error and the effects it had on net income and comprehensive income, stating:

- Under the iron curtain method, the effects of a cumulative correction on the Company's projected 2018 income statement, however, would be material. For instance, the impact of correcting the error in 2018 would be a charge of (i) $1,018 million to income before taxes, and (ii) $770

million to net income. This would represent a greater than 10% impact on both of the forecasted 2018 amounts. Accordingly, ***we have concluded that the error cannot be corrected through the 2018 income statement and must, therefore be corrected via a revision of prior periods***

- In order to assess whether the revision for this error represents a material restatement or immaterial restatement (i.e. revision), we utilized the rollover method to quantify the amount by which each affected income statement and statement of cash flows in the last five years was actually misstated, and quarterly periods for the latest two years. Additionally, as part of this analysis, we calculated the cumulative effect of the uncorrected error on the balance sheets at the end of each such period. The rollover method analysis indicates that the restatement is not quantitatively material because the effects of the error on the misstated income statements, statements of cash flows and balance sheets of those prior periods is less than 5% of all key metrics in each period, ***with the exception of net income (-6.5%) and comprehensive income (-5.0%) for the year ended December 31, 2017.*** This was primarily due to an increase in the Company's tax provision as a result of US Tax Reform enacted in December 2017. The impact of US Tax Reform was considered unusual and infrequent in nature, and furthermore, the Company has disclosed the effects of tax reform through its earnings releases and periodic financial statements. Excluding the impact of US Tax Reform, the impact of the error on our 2017 net income is $27 million or 0.5%. This error also had no overall impact on cash flows from operations.

160.   This statement revealed to the market that Honeywell would have to issue a restatement for Bendix asbestos-related liabilities, and the negative affect it would have on net income and comprehensive income. This revealed that the prior numbers relating to Bendix's asbestos-related liabilities and net income disseminated by Honeywell were in fact, false.

161.   Appendix A then discussed exactly how long Honeywell could estimate it liabilities for, and the factors used to decide to correct the error.

> As indicated previously, in August 2018, ***management concluded it should adjust the Bendix asbestos liability to reflect the full term of the epidemiological projections through 2059, and therefore, determined that it had historically incorrectly applied the provisions of ASC 450, Contingencies, in measuring its Bendix asbestos liability related to unasserted claims***. This error, and the related control deficiency, were identified during the course of the SEC Staff's review of the Form 10 filing related to Garrett Motion Inc.
>
> Our conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), (ii) ***noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies*** (again because of such time horizon subjectivity), and (iii) ***concluding that such an adjustment would facilitate comparability between Honeywell, Garrett Motion Inc., and the companies' respective peers***. Therefore, with the assistance of an external specialist, and utilizing a model with actuarial inputs, Honeywell has and will continue in the future to consider the full term of epidemiological projections of future incidents of asbestos-related disease to estimate its probable and reasonably estimable Bendix asbestos-related liability.

162.   This statement revealed to the market that Honeywell in fact should have been recording Bendix's asbestos-related liabilities out to 2059, not just a five year horizon as it had done historically. This showed that Honeywell's prior statement that Honeywell did not have a reasonable basis for estimating asbestos claims beyond the next five years, was actually false.

163.   Appendix A also identified the control that was deficient and the root cause for the deficiency. Specifically, Appendix A states:

*Control Identified*

***The error that was identified is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted.***

As noted in the summary of the accounting process for unasserted claims above, we use a third-party specialist to assist in assessing the required Bendix unasserted claims liability. The Company has designed a relevant internal control over that process. ***We identified an operating effectiveness deficiency related to that internal control activity.*** The specific control activity is the "Bendix Reserves True-up" control, which states that "…Honeywell's third-party service provider calculates the average resolution values on which Honeywell bases its estimates of the total liability associated with its current and future Bendix asbestos claims. The year-end reserve is updated based on the new average resolution values and is approved by Management." This key control is specific to Bendix-related asbestos reserves where, on an annual basis, the Bendix-related asbestos reserves are adjusted to properly reflect current year estimates regarding both resolution values and estimated future claimants based on anticipated changes in the population of claims. Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions. Management has historically, as part of this process, held discussions with the specialist regarding

the time horizon used for the estimation of the future unasserted claims.  Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

*      *      *

*Nature and Root Cause*

. . . However, in connection with the performance of this control, ***the Company inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon. The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence***.

164.   The above information revealed the extent of the control weakness and the fact that Honeywell ignored information when determining the horizon for Bendix's asbestos-related liabilities. This showed that the prior statements that Honeywell did not have a reasonable basis for estimating asbestos claims beyond the next five years, as well as Defendants' SOX certification were actually false.

165.   Appendix A also informed investors that Honeywell had the information needed to determine the deficiency at an earlier point. Specifically, Appendix A states:

> ***We concluded it was appropriate to revise prior periods when correcting the error under SAB 99***. This consideration implies that ***there was information available that should have caused us to modify the time horizon used for the Bendix unasserted claims liability at***

*an earlier point.* The specific time horizon is subjective in
nature given the assessment of all available information.

166.    This statement again revealed to the market that the error was so severe
that it would result in a restatement. This revealed that the prior numbers relating to
Bendix's asbestos-related liabilities and net income disseminated by Honeywell
were in fact, false.

167.    This also told investors that Honeywell had the information to find the
error well before Honeywell decided to review or disclose it. This shows the extent
of Honeywell's internal weakness, and that its previous SOX certification were false.

168.    Appendix A also determined that Defendants prior SOX certifications
were materially false. Specifically, Appendix A states:

### SOX 404 Assessment Conclusion

Based on the considerations above, we concluded that
there was not a material weakness in internal control.
However, we determined that the deficiency is important
enough to merit the attention of those responsible for
oversight of the Company's financial reporting and
internal controls, and therefore *Management concluded
that a significant deficiency in internal controls over
financial reporting existed*. Specifically, the identified
Bendix asbestos control did not operate effectively
because the Company inappropriately relied on limited
objective and verifiable data to justify its use of a five-year
horizon. We did not consider all available evidence to
evaluate whether we should apply the full term of the
epidemiological studies. The Company focused too
heavily on the emerging science and studies that indicated
the nature and application of the asbestos used at Bendix
does not cause disease, and on evidence of improvements
in the tort system with regards to resolution of asbestos
claims.

169. This correspondence revealed to the market that Honeywell's previous SOX certifications were in fact false due to a significant deficiency internal controls over financial reporting.

170. Despite the admissions and revelations contained in Honeywell's August 20, 2018 correspondence with the SEC, it still misled investors by attempting to portray Honeywell's conduct in a nonculpable light. Moreover, given the manner in which the correspondence was released, many investors were unaware of Defendants' admissions or that it had engaged in an intentional violation of generally accepted accounting standards when providing the public with estimates of its Bendix asbestos-related liability.

### October 19, 2018 Form 10-Q

171. The full extent of Honeywell's improper accounting for its asbestos liability attributable to Bendix was revealed on October 19, 2018, when Honeywell issued a press release announcing its third quarter 2018 earnings, which was also attached as Exhibit 99 to Form 8-K, and filed its quarterly report with the SEC for the quarter ended September 30, 2018.

172. In the Q3'18 10-Q, Honeywell disclosed the following:

> In the third quarter of 2018, the Company revised its accounting to correct the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims. The prior accounting treatment applied a five-year time horizon; *the revised treatment reflects the full term of epidemiological projections through 2059. Previously issued financial statements have been revised for this correction with the following effects: The Company's revised estimated asbestos-related liabilities are now $2,610 million as of December 31, 2017, which is $1,087 million higher than the Company's prior estimate*. The Company's Insurance recoveries for asbestos-related

liabilities are estimated to be $503 million as of December 31, 2017, which is $68 million higher than the Company's prior estimate. As of December 31, 2017, the net deferred income taxes impact was $245 million, with a decrease to liabilities and increase to assets, and the cumulative impact on Retained earnings was a decrease of $774 million. For the three and nine months ended September 30, 2017, Cost of services sold increased $5 million and $2 million, Tax expense decreased $2 million and $0 million, and Net income decreased $3 million and $2 million.

This revision followed the Securities and Exchange Commission (SEC) Division of Corporation Finance review of our Annual Report on Form 10-K for 2017, which included review of our prior accounting for liability for unasserted Bendix-related asbestos claims. ***On September 13, 2018, following completion of Corporation Finance's review, the SEC Division of Enforcement advised that it has opened an investigation related to this matter***. Honeywell intends to provide requested information and otherwise fully cooperate with the SEC staff.

173.   This revealed to the market the true extent of Honeywell's accounting errors, and the fact that Honeywell was under a formal investigation by the SEC in connection with its accounting for asbestos liabilities. Whereas prior disclosures claimed that Honeywell was justified in its accounting treatment for Bendix asbestos-related liability, the fact that the SEC was investigating Honeywell for exactly that matter cast significant doubt on the company's prior statements. The fact of the matter was that Honeywell had intentionally violated generally accepted accounting principles and now, as a result, the SEC's Division of Enforcement was investigating it.

**J.    Defendants Acted with Scienter.**

174.   Honeywell intentionally used a five year horizon to estimate its Bendix exposure, as admitted by Honeywell in the 2017 10-K. In pertinent part, Honeywell explained that: "The liability for future claims represents the estimated value of future asbestos-related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years."

175.   Honeywell knew that using a five year horizon was unacceptable, improper, and misleading. On August 14, 2018, the SEC's Division of Corporation Finance notified Honeywell that the company's estimate for Bendix asbestos-related liabilities was in violation of ASC 450. On August 20, 2018, John Tus, Honeywell's Vice President and Controller, responded to the SEC by agreeing with the SEC and admitting that Honeywell had been improperly accounting for its Bendix exposure.

176.   In pertinent part, Tus acknowledged that ASC 450 was "the authoritative accounting standard under U.S. GAAP concerning loss contingencies" and that it required Honeywell to "accrue for a loss when that loss is both probable and reasonably estimable (ASC 450-20-25-2)." Tus also acknowledged that "Honeywell determined that [it] had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims. Specifically, [it] concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability" and not, as it had been doing, accounting for only a five year horizon.

177.   Tus's letter included an appendix. In the appendix, Tus admitted that Honeywell maintained a "control" during the Class Period that systematically yielded a favorable Bendix exposure figure. The control, as explained by Tus, "inappropriately relied on limited objective and verifiable data to justify its use of a

five-year horizon. The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence."

178.  Tus further confirmed that this control was developed and/or approved by Honeywell's "Management," *i.e.*, Adamczyk and Szlosek. In pertinent part, Tus wrote that the Bendix reserves are "approved by Management" after "Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions. Management has historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims. Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger."

179.  Further establishing scienter on the part of Honeywell, Adamczyk and Szlosek is the fact that its accounting for Bendix liability was different from and at odds with its accounting for other asbestos-related liability, namely the NARCO asbestos liability. For NARCO, Honeywell estimated asbestos-related liability across a 15-year timeline. Thus, despite the fact that Honeywell had less "real-time data of claims asserted, dismissal rates and resolution values" than it had for Bendix, Honeywell was still able to comply with ASC 450. Honeywell's accounting for

NARCO, therefore, shows that the company knew how to comply with ASC 450 but intentionally declined to do so.

180.   Honeywell's decision to use a five year horizon was also at odds with and contrary to industry practices, as evidenced by the accounting practices of other companies with asbestos-related litigation exposure. Indeed, as stated in the appendix to Honeywell's August 20, 2018 response to the SEC, its "conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), [and] (ii) noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies (again because of such time horizon subjectivity) . . . . The Company also had conversations between management [Adamczyk and Szlosek], its third-party specialists and outside counsel about what appeared to be a movement of companies to extend out the time horizon."

181.  For example, Dow Chemical Company had been estimating the potential asbestos liability for its Union Carbide subsidiary for 15 year periods since 2002 and in 2016 began providing for potential future asbestos liability through to 2049. Similarly, Owens-Illinois, Inc., another company widely known for its asbestos-related liability exposure, had been estimating its exposure by using an annual rolling estimate over three-year periods. In May 2016, Owens-Illinois revised its accounting estimates to reflect potential liability over an indefinite period of time into the future. Owens-Illinois changed its accounting for asbestos-related liability in response to direction from the SEC. In 2016, Crown Holdings, Inc. also changed its accounting for asbestos related liabilities. Previously, Crown Holdings, Inc. "estimated probable costs for claims through the year 2025." However, beginning in Crown Holdings, Inc. Form 10-K for year-end 2016, Crown Holdings began

accounting for asbestos-related liabilities "without limitation to a specified time period."

182.   In 2007, Ingersoll-Rand changed its accounting under ASC 450 for asbestos-related liabilities from seven years into the future out until 2053, "the period over which the Company has and is likely to resolve asbestos-related claims against it in the future." Further, since 2007, the 3M Company has projected its asbestos-related liability out based on the amount of future projected claims for an indefinite period of time into the future.

183.   Notwithstanding the above, Honeywell still used a five year horizon. As a result, Honeywell was able to conceal over $1.1 billion of additional asbestos-related exposure relating to Bendix alone. In turn, Honeywell was able to inflate its net income by 6.5% and comprehensive income by 5% for the year ended December 31, 2017 (excluding Honeywell's provision for tax reform in 2017).

184.   Adamczyk, as CEO, and Szlosek, as CFO, were responsible for all of Honeywell's actions, including its day-to-day affairs as well as the contents of the quarterly and annual reports that Honeywell filed with the SEC. Therefore, Adamczyk and Szlosek acted with scienter by causing Honeywell to make the misleading Bendix disclosures.

185.   Proof of scienter on the part of Adamczyk and Szlosek is evident in the fact that they signed certifications under the Sarbanes-Oxley Act of 2002 in connection with Honeywell's quarterly and annual reports. These certifications represented that Adamczyk and Szlosek "certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that: . . . The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." This was not true and, as established above, Adamczyk and Szlosek knew it.

186.   In particular, Adamczyk and Szlosek certified the accuracy of the Q2'18 10-Q despite being aware that Honeywell was improperly accounting for its Bendix asbestos-related liability. As stated in Honeywell's August 20, 2018 response to the SEC, Honeywell was aware of "the error" pertaining to its liability estimates "subsequent to the quarter ended June 30, 2018," yet Adamczyk and Szlosek certified the Q2'18 10-Q (dated July 20, 2018) notwithstanding.

187.   Moreover, during the course of the Class Period, Adamczyk and Szlosek repeatedly attempted to conceal and/or cover up disclosures about the company's accounting scheme. On August 23, 2018, Honeywell timed its announcement about the new Bendix liability numbers to coincide with a press release detailing several developments within Honeywell, including the issuance of Form 10's relating to the company's spin-offs of Garrett Motion Inc. and Resideo Technologies, Inc. and an upward revision of full-year earnings-per-share guidance by $0.05 per share (to $8.10-$8.20).

188.   Defendants' strategy worked, as analysts and the market largely ignored the news about the Bendix estimates and faulty internal controls. Indeed, Deutsche Bank wrote on August 23, 2018, "[n]et/net, we viewed today's news as positive, and expect the stock to outperform modestly on the back of the guidance raise and spin progress." Likewise, RBC Capital Markets wrote on August 23, 2018, that "the accounting revision [would] have an immaterial positive impact to its full year 2018 adjusted EPS."

189.   Defendants' timing of the August 23, 2018 press release was not a coincidence. Proof of this is evident in the fact that they employed similar tactics on October 10, 2018. Despite the release of damning correspondence with the SEC, Honeywell issued no press release and did not even mention the word "asbestos" in an investor conference that it hosted that same day. Thus, once again, Honeywell

effectively concealed the truth about its accounting scheme in hopes that it would remain hidden.

190.  Given the nature of the statements at hand and the falsity with which they were made, Honeywell acted with corporate scienter. It is implausible that Honeywell would have made the statements it did in its filings with the SEC unless its senior management approved the statements and authorized their filing.

## K.  Loss Causation and Economic Harm.

191.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Honeywell securities in response to company-specific news, *i.e.*, Honeywell's restatement and deficient internal controls and procedures, Plaintiff and the other Class members have suffered significant damages.

192.  During the Class Period, Defendants concealed from Plaintiff and other Class members the true extent of its Bendix asbestos-related liability and the sufficiency of its internal controls over financial reporting and public disclosures concerning the same. The 2017 10-K, Q1'18 10-Q, and Q2'18 10-Q each provided investors with a false account of the company's estimated liability. This, in turn, fostered a false sense of security in investors and created a misleading impression that Honeywell was a safer investment than it truly was. As a result of these misrepresentations and/or omissions, Honeywell's stock price was artificially inflated during the Class Period.

193.  Honeywell disclosed the truth about its Bendix asbestos-related liability to the market in piecemeal fashion. First, on August 23, 2018, the company said it would need to "revise[] its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims" and indicated that its Bendix asbestos-related liability would

need to be increased by $1.083 billion (from $610 million to $1.693 billion as of June 30, 2018).

194.   Honeywell timed its August 23, 2018 announcement to coincide with a press release detailing several developments, including Form 10's relating to the company's spin-offs of Garrett Motion Inc. and Resideo Technologies, Inc. and an upward revision of full-year earnings-per-share guidance by $0.05 per share (to $8.10-$8.20). Accordingly, despite the significant increase in Bendix asbestos-related liability and disclosure about faulty internal accounting, "[n]et/net, [analysts] view[ed] today's news as positive, and expect[ed] the stock to outperform modestly on the back of the guidance raise and spin progress." [Deutsche Bank, *Our Thoughts on HON's Guidance Raise* (Aug. 23, 2018)] Analysts also focused on Honeywell's claim that "the accounting revision [would] have an immaterial positive impact to its full year 2018 adjusted EPS." [RBC Capital Markets, *HON – Turbo and Homes Spins on Track; Boosts 2018 EPS Guidance by 5c/0.6%* (Aug. 23, 2018)]

195.   Honeywell released its August 23, 2018 announcement about the Bendix liability and its August 23, 2018 press release about the spin-offs both before market open, effectively burying the former under the latter. In so doing, Honeywell attempted to prevent its stock price from declining in response to the disclosure about its Bendix liability and maintain the artificial inflation that was present within its stock price at that time. However, despite Honeywell's efforts, the market still took note of the news and, from an opening market price of $151.30 per share on August 23, 2018, Honeywell's stock price declined to an adjusted closing price of $149.33 per share on August 24, 2018.

196.   On October 10, 2018, during trading hours, Honeywell revealed additional information about its Bendix asbestos-related liability when its correspondence with the SEC dated August 14 and 20, 2018 became publicly available on the SEC's EDGAR website. The correspondence disclosed in detail that

Honeywell's internal controls for determining the Bendix asbestos-related liability had been deficient. The correspondence also contained admissions on behalf of Honeywell that it had been intentionally accounting for the liability improperly under "the authoritative accounting standard under U.S. GAAP concerning loss contingencies." In response to this news, Honeywell's stock price declined from an opening market price of $155.76 on October 10, 2018 to an adjusted closing price of $147.24 per share on October 11, 2018.

197.    Honeywell once again attempted to hide the disclosure from the market. It did not issue any press releases concerning the August 2018 SEC correspondence nor did it even mention the word "asbestos" in an investor conference that it hosted that same day the correspondence was made public on October 10, 2018. Thus, once again, Honeywell was able to stem the decline in its stock price and largely maintain its artificially inflated stock price.

198.    On October 19, 2018, Honeywell was no longer able to keep investors in the dark about its Bendix liability accounting scheme. Before market hours, the company released the Q3'18 10-Q which included the new Bendix asbestos-related liability figures as well as the fact that it received notice from the SEC on September 13, 2018 that it was under investigation by the SEC's Division of Enforcement.

199.    This was material news for Honeywell investors. Indeed, on October 19, 2018, the *Wall Street Journal* immediately published an article, titled *SEC Opens Investigation Into Honeywell's Asbestos Accounting*. In pertinent part, the article stated that the "Securities and Exchange Commission ha[d] opened an investigation into the company's accounting for asbestos-related liabilities" following "discussions with the SEC that prompted it to correct and restate its asbestos liabilities by about $1.1 billion more than its prior estimate."

200.    Following Honeywell's disclosure of the new Bendix liability figures and the SEC investigation, its stock price declined substantially. Honeywell's

76

opening stock price on October 19, 2018 was $151.26 per share. From there, it declined to an adjusted market closing price of $146.28 per share on October 22, 2018 (the following trading day), and continued to fall further on October 23, 2018 ($144.35 adj. close) and October 24, 2018 ($139.31 adj. close).

201.   Defendants concealed material information from investors about its Bendix asbestos-related liability. This deception misled the market about the risks of their investments in Honeywell as well as exposed investors to heightened regulatory scrutiny and penalties. The SEC investigation, in particular, was a natural and foreseeable result from engaging in the accounting fraud alleged herein. As the truth concerning Defendants' accounting scheme came to light, Honeywell's stock price declined significantly. From a Class Period high of $161.28 per share, Honeywell's stock eventually fell to $140.83 per share following the end of the Class Period. The rise and fall of Honeywell's stock amounted to a total market capitalization loss of more than $14.8 billion.

202.   The decline in the price of Honeywell securities caused economic harm to Plaintiff and other Class members as the value of their investments declined due to the fraud alleged herein.

**L.      Presumption of Reliance; Fraud-On-The-Market.**

203.   At all relevant times, the market for Honeywell securities was an efficient market for the following reasons, among others:

> a.      Honeywell's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;
>
> b.      Honeywell communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services;

c.   Honeywell was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.   Unexpected material news about Honeywell was reflected in and incorporated into its stock price during the Class Period.

204.   As a result of the foregoing, the market for Honeywell securities promptly digested current information regarding Honeywell from all publicly available sources and reflected such information in Honeywell's stock price. Under these circumstances, all purchasers of Honeywell securities during the Class Period suffered similar injury through their purchase of Honeywell securities at artificially inflated prices, and a presumption of reliance applies.

205.   Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**M.   No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine.**

206.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint because they are not forward looking

statement which are the only statements that can be protected by the statutory safe harbor.

207.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

208.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, even if they were identified as "forward looking statements," which they were not, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Honeywell who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

209.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Honeywell securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of

Honeywell, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

210.   The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Honeywell common stock was actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believe that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by Honeywell or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of September 30, 2018, there were 740,288,303 shares of Honeywell common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

211.   Plaintiff's claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

212.   Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

213.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

        a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, practices, policies and management of Honeywell;

c.     whether the Individual Defendants caused Honeywell to issue materially false and misleading statements during the Class Period;

d.     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

e.     whether the prices of Honeywell securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

f.     whether the Class members have sustained damages and, if so, what is the proper measure of damages.

214.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against Defendants for Violations of Section 10(b) and Rule 10b-5

215.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

216.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

217.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Honeywell securities; and (iii) cause Plaintiff and the other Class members to purchase or otherwise acquire Honeywell securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

218.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Honeywell securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Honeywell's finances and business prospects.

219.   By virtue of their positions at Honeywell, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the

materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

220.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Honeywell, the Individual Defendants had knowledge of the details of Honeywell's internal affairs.

221.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Honeywell. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Honeywell's businesses, operations, controls, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Honeywell securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Honeywell's accounting and controls which were concealed by defendants, Plaintiff and the other Class members purchased or otherwise acquired Honeywell securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

222.   During the Class Period, Honeywell securities were traded on an active and efficient market. Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made,

issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Honeywell securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the other Class members, the true value of Honeywell securities were substantially lower than the prices paid by Plaintiff and the other Class members. The market price of Honeywell securities declined sharply upon public disclosure of the facts alleged herein to have been misrepresented or omitted by Defendants to the injury of Plaintiff and other Class members.

223.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases, of Honeywell securities during the Class Period, upon the disclosure that it had been disseminating misrepresented facts about Honeywell and its business, controls, practices and policies to the investing public.

## <u>COUNT II</u>

### Against the Individual Defendants for Violations of Section 20(a)

225.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

226.   During the Class Period, the Individual Defendants participated in the operation and management of Honeywell, and conducted and participated, directly and indirectly, in the conduct of Honeywell's business affairs. Because of their

senior positions, they knew the adverse non-public information about Honeywell's misstatement of its accounting and controls.

227. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Honeywell's accounting and controls, and to correct promptly any public statements issued by Honeywell which had become materially false or misleading.

228. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Honeywell disseminated in the marketplace during the Class Period concerning Honeywell's accounting and controls. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Honeywell to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Honeywell within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Honeywell securities.

229. Each of the Individual Defendants, therefore, acted as a controlling person of Honeywell. By reason of their senior management positions and/or being directors of Honeywell, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Honeywell to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Honeywell and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other Class members complain.

230.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Honeywell.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

  a. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative and its counsel as Class Counsel;

  b. Requiring Defendants to pay damages sustained by Plaintiff and the other Class members by reason of the acts and transactions alleged herein;

  c. Awarding Plaintiff and the other Class members pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

  d. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: May 15, 2019    **LEVI & KORSINSKY, LLP**

          s/ Eduard Korsinsky
         Eduard Korsinsky (EK-8989)
         55 Broadway, 10th Floor
         New York, New York 10006
         Tel.:  (212) 363-7500
         Fax:  (212) 363-7171

Email: ek@zlk.com

-and-

Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

-and-

Nancy A. Kulesa
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
Email: nkulesa@zlk.com

*Attorneys for Plaintiff
and Lead Counsel for the Class*